*Spering, for defendant.*

---

*Court of Common Pleas, Dauphin County, December 31st, 1862.*

THE COMMONWEALTH OF PENNSYLVANIA v. DREXEL & CO.

Under the act of 16th May, 1861, the tax upon discounts is not to be computed upon the face value of the paper discounted, but upon the actual profit of the transaction.   This law has not a retroactive effect, and imposes no tax upon transactions before its date.   Under this law brokers and private bankers are obliged to so keep their accounts as to be able to make a statement of them to the treasury department on the first Monday in December, or they will have to pay the penalty imposed by law.

BY THE COURT.—This proceeding was instituted to collect the penalty of one thousand dollars, imposed by the 3d section of the act

of 16th May, 1861, relating to brokers and private bankers. The act requires every stock, bill, exchange, real estate broker and private banker on or before the first Monday in December, then next, and on or before the same day in each year thereafter, to make a written return under oath to the auditor-general of the amount of his receipts from commissions, discounts, abatements, allowances, and all other profits arising from his business during the year ending on the 30th day of November, preceding the date of such annual return, and to forthwith pay into the State treasury three per centum upon the aggregate amount contained in such return. Many questions have been raised on the construction of the statute, and much evidence received as to the practice of brokers and private bankers in keeping their accounts. But we conceive there are but few points of difficulty in the case as we construe the act of Assembly. The attorney-general contends that the word "*discount*" as used in this statute should be construed literally and according to its ordinary signification. And, therefore, if a bond, bill of exchange, promissory note, or bank note is purchased for one-half of its face, the tax must be paid at the rate of three per cent. on the other half, although the same paper is sold on the same or next day in. the usual course of business at the advance of only one per cent. on the price of the purchase, and therefore the broker could readily state the required account, as their books show the discount made on such paper back to the 30th day of November, 1860, although they are not so kept as to show the profit on net sales, or in fact any sales, or whether the money was collected, or lost. We do not so understand the act of Assembly, but putting a construction on the whole law, we are satisfied that the framers in this case understood "discounts" as synonymous with "commissions," as the whole is qualified by the expression "all the profits arising from his business." It rarely happens that the discount deducted shows the profits, as it is the business of the broker to sell as well as to buy. The tax is imposed on the discount "*received;*" corporation bonds or stocks are frequenty purchased at a discount of twenty-five, fifty, and sometimes seventy-five per cent. less than their face, and immediately resold at an advance of one-half, one, or two per cent., and to impose a tax of three per centum on each transaction of this kind which passed through the hands of the various brokers, would be to exclude all such paper from the market. Besides although purchased at a heavy discount, it is not unfrequently resold by the broker at an actual loss, or in the case of mercantile paper, it is through the insolvency of the parties, never collected, and no discount is received. Is that to be subject to a tax of three per cent. on the discount? If so, the worse the paper, and the heavier the risk, the greater must be the tax. I am of the opinion that the framers of the law, by all of its expressions, and giving full force to every word intended to impose the tax of three per

cent. upon the "*net*" profits of the business, from whichever source derived, whether from "commissions," "discounts," "abatements," or "allowances," and it is very manifest that the framers of the statute used phrases unknown to the board of brokers, and of the meaning of which the legislature was profoundly ignorant. Taking the meaning of the law to be as declared, many of the points raised by the defendants' counsel would properly arise,— but for another position to be stated,—as it is very clear from the method of keeping the defendants' books, that it was *impossible* for them to present the required statement, but we construe the law differently from the counsel on either side. Both contend that it is retroactive in its effect, and requires the tax to be paid on all business transacted between the 30th day of November, 1860, and the 16th day of May, 1861. We do not so understand it. On the contrary, a decent respect for a co-ordinate power of the government obliges us so to construe the law as to prevent its working injustice, or applying its operation and burdens on transactions completely past, but to have it take effect from the time of its passage only, as is the case with all just and proper legislation. We fully concur in what is said by the defendants' counsel, that taxes should be imposed on persons, property, privileges, or franchises in the nature of property, and not on matters of business transacted and closed before the enactment of the law, and that leads us to the conclusion that the legislature never intended it to have a retroactive effect. Nothing could be more unjust than to now impose a tax for the years 1859 or 1860 on lands which had gone into the hands of a new owner in 1861, unless it might be to burden a contract of buying and selling with a similar tax long after the business was closed.

Suppose the tax imposed by this law on the amount of discount, as contended by the attorney-general, and the defendants had, in January, 1861, bought a bond or the stock of a corporation calling on its face for one thousand dollars for the sum of five hundred dollars, the tax on the discount would be fifteen dollars, and that they had sold it the next day at an advance of one per cent. to another broker, who again at once sold it at a like advance, would it be just to tax each transaction with fifteen dollars when the profit was but five? This is not an isolated or supposititious case, but the daily business of brokers. But if we impose the tax on the profit alone, the operation will be equally unjust, but not to the same extent. It may be fairly supposed that, in very many cases, had the transaction been subject to this tax, it would either never have transpired, or been conducted on very different terms. It should require clear and express words to justify us in giving any tax law a retroactive effect and applying it to transactions entirely past. The law under consideration is by no means clear. It provides for a statement

[The Commonwealth of Pennsylvania *v.* Drexel & Co.]

on the succeeding first Monday of December, but does not say that it must embrace the time from the preceding thirtieth day of November, but that expression applies to future reports. That for the current year, as we understand the law, should contain an exhibit of the amount of the brokers' "receipts from commissions, discounts," etc., from the 16th of May, 1861, until the first Monday in December, 1861, and need not go further back, as the law only went into effect from the time of its passage. From that time forth, proper accounts should have been kept so as to exhibit the business, and the failure to do so and present the statement as required, subjects the delinquent to the penalty of one thousand dollars, which was properly imposed by the auditor-general, not for failing to exhibit an account of the transactions of the year, but for neglecting to present any account whatever. The defendants were as much bound to make a report of their dealings and pay the tax thereon from the 16th day of May till the first Monday of December, as they would have been had they commenced to act as brokers on that day. It is further contended that it is impossible to state an account of the year's business, or even for that of six months, between the 30th of November, Saturday, and the 2d of December, Monday, and, therefore, the impossibility will excuse from the penalty. From the time this law passed, it was the duty of every broker so to keep his accounts as to enable him to state them at the treasury on the day prescribed, and at most, he would have been obliged to make up a statement of Saturday's business alone on that day, which it will scarcely be pretended could not have been readily done. We cannot relieve him from the penalty for that reason. We deem it unnecessary to answer the various points presented by the defendants' counsel; many of them may be correct in the abstract, but under our views of the law of this case and of the time the act of Assembly went into effect, they are unimportant. If we have erred in the construction of the act, the Supreme Court can correct the error, and then many of them will fairly arise.

As no return or report was made by the defendants as required, they are subject to the penalty of one thousand dollars imposed by the law, for which your verdict must be rendered in this case, but without interest, as none is given for the non-payment of a penalty, even when presented in the form of a report by the auditor-general.

AFFIRMED BY THE SUPREME COURT (10 Wright, 31).

*Meredith,* for plaintiff.

*McMurtrie* and *Bullitt,* for defendant.